ACCEPTED
14-15-00032-CR
FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS
12/8/2015 1:11:55 PM
CHRISTOPHER PRINE
CLERK

## NO. 14-15-00032-CR

### IN THE COURT OF APPEALS

### FOURTEENTH DISTRICT OF TEXAS

### HOUSTON, TEXAS

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
12/8/2015 1:11:55 PM
CHRISTOPHER A. PRINE
Clerk

| | | |
|---|---|---|
| LINDA WOODMAN | § | APPELLANT |
| VS. | § | |
| THE STATE OF TEXAS | § | APPELLEE |

### APPEAL FROM THE 147TH JUDICIAL DISTRICT COURT

### TRAVIS COUNTY, TEXAS

### CAUSE NO. D-1-DC-14-904028

### STATE'S BRIEF

**ROSEMARY LEHMBERG**
District Attorney
Travis County, Texas

**Lisa Stewart**
Assistant District Attorney
State Bar No. 06022700
Lisa.Stewart@traviscountytx.gov
AppellateTCDA@traviscountytx.gov
P.O. Box 1748
Austin, Texas 78767
(512) 854-9400
Fax No. 854-4810

Oral Argument Not Requested

# TABLE OF CONTENTS

**TABLE OF CONTENTS** ...................................................................................... 2

**INDEX OF AUTHORITIES** ............................................................................. 3

**STATEMENT OF THE CASE** ......................................................................... 5

**SUMMARY OF THE ARGUMENTS** ............................................................ 6

**STATEMENT OF FACTS FROM GUILT/INNOCENCE** ...................................... 13

**STATE'S REPLY TO APPELLANT'S FIRST POINT OF ERROR** ...................... 28

Appellant failed to preserve any alleged error for review on her motions for continuance. Appellant's first motion was written but not sworn as required by Art. 29.08, V.A.C.C.P., and appellant's second motion was oral and unsworn.   Alternatively, the trial court did not abuse its discretion in denying appellant's motion for continuance. ................................................28

**STATE'S REPLY TO APPELLANT'S SECOND POINT OF ERROR** .................. 40

The trial court did not err in refusing appellant's requested instruction on involuntary intoxication.  Alternatively, assuming any alleged error, appellant did not suffer any harm....40

**STATE'S REPLY TO APPELLANT'S THIRD POINT OF ERROR** ..................... 46

The trial court did not deny appellant a hearing on her motion for new trial.  The trial court did not abuse its discretion in its conduct of the evidentiary hearing on appellant's motion for new trial as appellant was not entitled to present live testimony at the hearing per Rule 21.7. Additionally, the trial court correctly determined that a visit to the crime scene was not an "outside influence" and that Rule 606(b) did not allow for any further inquiry.  Assuming any alleged error, it had no impact on the hypothetical average juror. ........................................46

**PRAYER** ........................................................................................................ 56

**CERTIFICATE OF COMPLIANCE** ............................................................ 57

**CERTIFICATE OF SERVICE** ...................................................................... 57

# INDEX OF AUTHORITIES

**Cases**

*Adanandus v. State*, 866 S.W.2d 210 (Tex.Crim.App. 1993) ......................................................43

*Aliff v. State*, 955 S.W.2d 891 (Tex.App. - El Paso 1997, no pet.)..............................................42

*Anderson v. State*, 301 S.W.3d 276 (Tex.Crim.App. 2009).....................................................34, 35

*Biagas v. State*, 177 S.W.3d 161 (Tex.App. – Houston [1st Dist.] 2005, pet. ref'd.)...................53

*Blackshear v. State*, 385 S.W.3d 589 (Tex.Crim.App. 2012) .................................................34, 35

*Brown v. State*, 290 S.W.3d 247 (Tex.App. – Fort Worth 2009, pet.ref'd.) ..........................28, 43

*Casey v. State*, 215 S.W.3d 870 (Tex.Crim.App. 2007) ........................................................8, 44

*Colyer v. State*, 428 S.W.3d 117 (Tex.Crim.App. 2014) ................................................50, 51, 53

*Farmer v. State*, 411 S.W.3d 901 (Tex.Crim.App. 2013)....................................... 40, 42, 43, 44

*Gallo v. State*, 239 S.W.3d 757 (Tex.Crim.App. 2007).........................................................36, 39

*Glover v. State*, 2004 Tex. App. LEXIS 4889 (Tex.App. – Houston [14th Dist.] 2004,
pet.dism'd.) (not designated for publication) ..............................................................35

*Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362 (Tex. 2000).........................................53

*Heiselbetz v. State*, 906 S.W.2d 500 (Tex.Crim.App. 1995).....................................................36

*Holden v. State*, 201 S.W.3d 761 (Tex.Crim.App. 2006) ..........................................................48

*Johnson v. State*, 257 S.W.3d 778 (Tex.App. – Texarkana 2008, pet.ref'd.)..............................35

*Kopanski v. State*, 713 S.W.2d 188 (Tex.App. – Corpus Christi 1986, no pet.) ....................36, 39

*McQuarrie v. State*, 380 S.W.3d 145 (Tex.Crim.App. 2012) ...............................................passim

*Mendenhall v. State*, 77 S.W.3d 815 (Tex.Crim.App. 2002) ....................................................42

*Middleton v. State*, 125 S.W.3d 450 (Tex.Crim.App. 2003)......................................................41

*Montgomery v. State*, 810 S.W.2d 372 (Tex.Crim.App. 1990)..............................................11, 54

*Nelson v. State*, 149 S.W.3d 206 (Tex.App. – Fort Worth 2004, no pet.) ..............................7, 42

*Ngo v. State*, 175 S.W.3d 738 (Tex.Crim.App. 2005) ...............................................................41

*Posey v. State*, 966 S.W.2d 57 (Tex.Crim.App. 1998) ..............................................................41

*Renteria v. State*, 206 S.W.3d 689 (Tex.Crim.App. 2006) ........................................................36

*Rivera v. State*, 89 S.W.3d 55 (Tex.Crim.App. 2002) ...............................................................48

*Rogers v. State*, 105 S.W.3d 630 (Tex.Crim.App. 2003)......................................................40, 43

*Romero v. State*, 800 S.W.2d 539 (Tex.Crim.App. 1990) .........................................................50

*Sakil v. State*, 287 S.W.3d 23 (Tex.Crim.App. 2009).............................................................8, 43

*Scott v. State*, 419 S.W.3d 698 (Tex.App. – Texarkana 2013, no pet.) ...............................48, 49

*See Prystash v. State*, 3 S.W.3d 522 (Tex.Crim.App. 1999), *cert.denied* 529 U.S. 1102 (2000) .50

*Skaggs v. State*, 18 S.W.3d 277 (Tex.App. – Austin 2003, pet.ref'd.) .......................................48

*Smith v. State*, 286 S.W.3d 333 (Tex.Crim.App. 2009)............................................................48

*Soliz v. State*, 779 S.W.2d 929 (Tex.App. – Corpus Christi 1989, no pet.) ..............................51

*Torres v. State*, 585 S.W.2d 746 (Tex.Crim.App. 1979) ..........................................................42

*White v. State*, 225 S.W.3d 571 (Tex.Crim.App. 2007)............................................................51

*Williams v. State*, 356 S.W.3d 508 (Tex.App. – Texarkana 2011, pet.ref'd.).............................35

**Statutes**

Art. 29.03, V.A.C.C.P. ................................................................................33, 35
Art. 29.08, V.A.C.C.P. ................................................................................27, 34
Art. 36.14, V.A.C.C.P. ..................................................................................8, 43
V.T.C.A. Penal Code §19.04 ..............................................................................5
V.T.C.A. Penal Code §8.01 ............................................................................7, 41

**Rules**

Tex.R.App.Proc. 21.7.............................................................................45, 48, 49
Tex.R.App.Proc. 9.4(e) ......................................................................................56
Tex.R.App.Proc. 9.4(i)(2)(A) .............................................................................56
Tex.R.Evid. 606(b)......................................................................................passim

**NO. 14-15-00032-CR**

**IN THE COURT OF APPEALS**

**FOURTEENTH DISTRICT OF TEXAS**

**HOUSTON, TEXAS**

| | | |
|---|---|---|
| LINDA WOODMAN | § | APPELLANT |
| VS. | § | |
| THE STATE OF TEXAS | § | APPELLEE |

APPEAL FROM THE 147TH JUDICIAL DISTRICT COURT

TRAVIS COUNTY, TEXAS

CAUSE NO. D-1-DC-14-904028

**TO THE HONORABLE COURT OF APPEALS:**

Now comes the State of Texas and files its brief in response to that of the appellant.

**STATEMENT OF THE CASE**

In a re-indictment, the State charged appellant with manslaughter committed with a deadly weapon, a motor vehicle. V.T.C.A. Penal Code §19.04. (CR 6-7). Appellant pled not guilty to the charged offense and had a jury trial.[1] (RR VI: 17).

---

[1] Upon motion by the State, this cause was consolidated with cause number D-1-DC-14-904029. (CR 15). Appellant also pled not guilty to this offense. (RR VI: 18).

The jury found appellant guilty of manslaughter, as alleged in the indictment. (CR 107). The jury rejected appellant's application for probation and assessed punishment as 20 years confinement in the Texas Department of Criminal Justice and a $10,000 fine. (CR 100, 117). Appellant timely filed a motion for new trial, which was denied. (CR 127-147, 173). The trial court certified appellant's right to appeal. (CR 110). Appellant timely filed notice of appeal. (CR 179-180).

## SUMMARY OF THE ARGUMENTS

*State's Reply to Appellant's First Point of Error*:

Appellant failed to preserve any alleged error for review on her motions for continuance. Appellant's first motion was written but not sworn as required by Art. 29.08, V.A.C.C.P.. Although defense counsel signed the motion, no oath or affirmation accompanied the signature. Appellant's second motion failed to comply with Art. 29.03, V.A.C.C.P. and Art. 29.08 because it was oral and unsworn. The failure to comply with the requisites of Arts. 29.03 and 29.08 waives error. *Blackshear*, 385 S.W.3d at 591.

Alternatively, the trial court did not abuse its discretion in denying appellant's motions for continuance. Medical records documenting that appellant had been advised not to drive were released to appellant approximately one year prior to trial. (Supp.CR 20; SX121). Additional evidence supporting that appellant had been told not to drive included the fact that appellant was not

6

allowed to drive home upon being discharged from the hospital. And, defense counsel knew before trial that nurse Wei had failed to include in her notes that appellant had been advised not to drive. While Dr. Konikkara's final report reflecting the admonition from Dr. Austin was not produced until August 18, 2014, earlier disclosed records stated that medical personnel had advised appellant not to drive. The trial court did not abuse its discretion in denying appellant's motion for continuance on this ground.

And, as to appellant's oral motion for continuance, appellant's bare assertion of inadequate time to employ an expert in hospital administration to explain SX133, the patient safety review form, is insufficient to establish prejudice, *Gallo*, 239 S.W.3d at 764, especially where three hospital employees were available at trial, appellant was able to question them, and one explained the form constituting SX133. Appellant vigorously cross-examined this witness during her testimony. (RR VIII: 173-185). The record reflects that appellant was ably represented by counsel throughout the trial. *Kopanski*, 713 S.W.2d 189.

***State's Reply to Appellant's Second Point of Error***:

The trial court did not err in refusing appellant's requested instruction on involuntary intoxication as it was not raised by the evidence. Texas recognizes an affirmative defense of involuntary intoxication. V.T.C.A. Penal Code §8.01(a). Involuntary intoxication is a defense to criminal culpability when it is shown that:

7

(1) the accused has exercised no independent judgment or volition in taking the intoxicant; and (2) as a result of his intoxication, the accused did not know that her conduct was wrong or was incapable of conforming her conduct to the requirement of the law he allegedly violated. *Mendenhall v. State*, 77 S.W.3d 815, 817 (Tex.Crim.App. 2002. Involuntary intoxication by prescription medication occurs only "if the individual had no knowledge of possible intoxicating side effects of the drug, since independent judgment is exercised in taking the drug as medicine, not as an intoxicant." *Nelson v. State*, 149 S.W.3d 206, 210 (Tex.App. – Fort Worth 2004, no pet.).

The evidence showed appellant was *voluntarily* intoxicated. At Seton hospital after her fainting spell, appellant repeatedly asked for the pain medicines Morphine and Percocet, one after another. Appellant was not forced to take them, nor were they given to her unknowingly. Also, after this offense, appellant admitted that she took between six and eight Percocet after having been released from Seton hospital. This medication she took on her own. And, evidence showed that appellant routinely took Percocet every four hours for pain. Appellant's repeated taking of the pain medications was a voluntary act, as was her driving of the car. *See Farmer*, 411 S.W.3d at 908. Hence, she was not entitled to an instruction on involuntary intoxication, and the trial judge did not err in denying her requested instruction.

Moreover, because the evidence at trial raised the issue of voluntary intoxication, the trial judge correctly instructed the jury on that issue as it was the law applicable to the case. *Sakil v. State*, 287 S.W.3d 23, 28 (Tex.Crim.App. 2009). Article 36.14 of the Code of Criminal Procedure mandates that a trial court submit a charge setting forth the law applicable to the case. *Posey v. State*, 966 S.W.2d 57, 62 (Tex.Crim.App. 1998). The trial judge set forth the law applicable to this case by tracking the language of Penal Code §§8.04(a) and (d). Thus, it was not an improper comment on the weight of the evidence. *See Casey v. State*, 215 S.W.3d 870, 886 (Tex.Crim.App. 2007).

Assuming any alleged error, appellant suffered no harm. In her jury argument, appellant noted the instruction on voluntary intoxication, but then stated that "frankly, though, this was involuntary intoxication." (RR IX: 75). Appellant argued that the jury could find her not guilty on that basis. (RR IX: 75). So, although an involuntary intoxication instruction was not included in the charge, the appellant presented it to the jury in her argument. Furthermore, the defense faulted the hospital for discharging an intoxicated appellant, and argued that appellant was confused due to the seizure she had suffered, had been in a postictal state, and suffered another seizure when she was driving. Appellant was therefore able to present her involuntariness argument to the jury and suffered no harm.

9

***State's Reply to Appellant's Third Point of Error***:

The trial court did not deny appellant a hearing on her motion for new trial. Appellant acknowledges in her brief at p. 43 that she "presented evidence in her motion for new trial and at the setting before the court that showed the juror had visited the crime scene during the pendency of the trial." The record reflects that the trial court conducted an evidentiary hearing on the motion for new trial, and, in that hearing, he considered the facts in appellant's motion and accompanying defense counsel's affidavit, the audiotape, and the parties' arguments. Appellant did not debate what juror Darnell stated in her audiotape.

Appellant's sole complaint on appeal is that she was not allowed to present live testimony from the juror at this hearing  By its express terms, Rule 21.7 did not entitle appellant to present live testimony. Thus, the trial court did not abuse its discretion in refusing live testimony on the motion. And, appellant did not offer Darnell's testimony via an affidavit, as allowed by Rule 21.7, or evidence from any other juror that Darnell relayed information about the crime scene to the rest of the jury. *See e.g. McQuarrie*, 380 S.W.3d at 148.

Because appellant has had a hearing on her motion for new trial and she does not contend that the trial court abused its discretion in denying her motion for new trial, this point of error should be overruled.

Furthermore, Texas Rule of Evidence 606(b) prohibited appellant's requested inquiries of juror Darnell, as the trial court correctly determined that the juror's visit to the crime scene was not an "outside influence." The crime scene was a public place, with which Darnell was familiar. It was not outside reference or source material. In *McQuarrie*, the juror obtained information from an unknown, outside resource on the internet. Here, any information juror Darnell obtained from her crime scene visit was not outside of her personal knowledge and experience. *McQuarrie*, 380 S.W.3d at 153. Additionally, the State had introduced substantial evidence regarding the extent of the crime scene with testimony from multiple witnesses, a diagram, and more than 50 photographs. Thus, it was not an "outside influence," and the trial court did not abuse its discretion in denying inquiry under Rule 606(b).

Also, Rule 606(b) prohibited appellant's requested inquiry into how Darnell reached her punishment verdict. Rule 606(b) prevents a juror from testifying that the jury discussed improper matters *during deliberation. McQuarrie*, 380 S.W.3d at 151 (emphasis in original). The trial court may not delve into deliberations or inquire as to the subjective thought processes and reactions of the jury. *McQuarrie*, 380 S.W.3d at 153. Thus, appellant could not query juror Darnell on her thought processes in reaching her punishment verdict because Rule 606(b) prohibits such an inquiry. Moreover, appellant's request to question juror Darnell

11

about her motivation for visiting the crime scene and explore that issue more fully was vague and not a relevant inquiry under Rule 606(b). The trial court's decision to not allow such inquiries was within the reasonable zone of reasonable disagreement and should not be disturbed on appeal. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App. 1990).

Finally, assuming the crime scene visit constituted an outside influence, it had no impact on the verdict as the trial court found. Upon a finding of an outside influence, the trial court is to make an objective determination as to whether the outside influence likely resulted in injury to the complaining party. *McQuarrie*, 380 S.W.3d at 154. The crime scene was a public area, in a busy shopping district near the University of Texas campus, with which the juror was familiar. Additionally, the State introduced approximately 50 photographs of the crime scene and a diagram. Testimony established that the crime scene was approximately 350 yards in length, from appellant's initial impact with the white BMW until she collided into the pole near the cleaners and was finally stopped.

The State argued for the maximum punishment under the law as the only means by which appellant would no longer be able to drive a car and be a threat to the community given her long history of abuse of prescription pain killers and her prior opportunity on community supervision for a vehicular collision in 2009, when she was intoxicated in a similar manner as this case. (RR X: 88). The length

12

of the crime scene was not addressed by the parties in the punishment phase, either via evidence or argument. There is no reasonable probability that juror Darnell's visit to the crime scene, a public place with which she was already familiar, had a prejudicial effect on the "hypothetical average juror." *McQuarrie*, 380 S.W.3d at 154.

Appellant's third point of error should be overruled for numerous reasons.

## STATEMENT OF FACTS FROM GUILT/INNOCENCE

In February of 2012, Dik van Meerten came to Austin for a family reunion. (RR VIII: 212). The evening of February 19, 2012, van Meerten had dinner with his son Aaron and Sarah Staten, Aaron's girlfriend. (RR VIII: 213). Since Staten had margaritas at dinner, she and van Meerten walked home, and Aaron drove her car home. (RR VIII: 214). Staten stopped at a drugstore for lotion, and van Meerten walked to Wheatsville Co-op to wait for her there. (RR VIII: 215). Shortly thereafter, Staten called Aaron and told him his father had been hit by a car. (RR VIII: 215). Aaron rushed to the scene and saw his father on the ground being attended to by a nurse. His father was barely breathing, and Aaron called to him so that he would know he was there. (RR VIII: 216). EMS transported van Meerten to Brackenridge Hospital emergency room, where a doctor informed Aaron that his father had died. (RR VIII: 218).

**The Facts of the Offense**

John Barkley lived on the north side of the Wheatsville Co-op in Central Austin. (RR VI: 39). On February 19, 2012, about 7:00 p.m., Barkley drove south on Guadalupe Street in his white BMW station wagon, preparing to turn into his driveway which was adjacent to Wheatsville. (RR VI: 41, 43). A very strong and loud force suddenly struck Barkley's vehicle, causing its airbags to deploy. (RR VI: 43-44). His car was struck from behind, spun around, and ended up in the Wheatsville parking lot facing the opposition direction. (RR VI: 44, 46). Barkley did not hear any sounds of breaking before the impact. (RR VI: 44-45). Upon realizing he had been in an accident, Barkley got out of his car and looked for the other car and driver. (RR VI: 46). But, there was no other car. (RR VI: 46).

That same evening, Arwen Tedhams shopped at Wheatsville and then exited the store parking lot in her vehicle to head north on Guadalupe Street. (RR VI: 57-58). As she waited at a red light, Tedhams saw a car come from the opposite direction, veer into her lane of traffic, and smash into the car in front of her. (RR VI: 59). It pushed a white BMW onto the curb. (RR VI: 61). The vehicle then quickly went into reverse and sped up. (RR VI: 61). The vehicle swerved into Tedhams' lane, then onto the sidewalk into a crowd of people, and then back into the street heading south in a northbound lane. (RR VI: 61, 66). The car travelled at an unsafe speed and did not yield to oncoming traffic. (RR VI: 69). It appeared to

14

Tedhams that the car was trying to leave the scene of the accident. (RR VI: 63). The car finally came to rest when it drove straight into a pole near a dry cleaning business, approximately 350 yards from the white BMW it initially hit. (RR VI: 68; RR VII: 63).

Tedhams exited her vehicle and checked on the driver in the white car, who was Barkley. (RR VI: 72). Tedhams then heard someone screaming "call 911." (RR VI: 72). She walked toward Wheatsville and saw two people lying on the ground. (RR VI: 73).

Diana Garcia lived in the condominiums across the street from Wheatsville and was walking to the grocery store to shop that evening when she heard screams and the sound of vehicles colliding. (RR VI: 89, 92-93). Garcia then heard the sound of metal being dragged along the ground, and she saw sparks flying from underneath a car. (RR VI: 93-94). That car had come off the sidewalk and gone back into the street, driving in the wrong direction, while it dragged the metal, which was a lamppost. (RR VI: 96, 97, 185). Garcia did not hear brakes, but rather the sound of a car accelerating. (RR VI: 96). She testified that the car "wasn't going to come to a stop until it hit that pole." (RR VI: 96). A young man helped the female driver, identified as appellant,[2] exit the car that hit the pole. (RR VI: 98). The appellant appeared unexpectedly "giddy" and "a bit happy[, l]ike she

_____

[2] *See* (RR VII: 123-124; SX65).

15

was off." (RR VI: 126, 149). Garcia identified the car as the Lexus in SX108. (RR VI: 98-99). Garcia noticed someone giving CPR to a male victim who was lying in a puddle of blood and appeared to be already dead. (RR VI: 99, 173).

That evening Teri Rodriguez set up a table outside Wheatsville to sell Girl Scout Cookies. (RR VI: 104). Rodriguez heard a loud crash to the north of her and saw sparks coming toward her and the troop. (RR VI: 107, 109). Rodriguez recalled seeing a vehicle come toward them, hearing impact and acceleration, and seeing a man on the ground in front of them. (RR VI: 111). The car went past them on the sidewalk.[3] (RR VI: 112). People were screaming; the scene was chaotic. (RR VI: 113). Rodriguez's son assisted a woman who was on the ground between the bike racks and pillar in front of Wheatsville. (RR VI: 115). She appeared to be "very injured," and Rodriguez called 911. (RR VI: 115).

Eric Rodriguez testified and corroborated much of his mother Teri's testimony regarding the facts of the offense. (RR VI: 128-135). Eric heard the car accelerating and the RPMs climbing as the car got closer to them. (RR VI: 134-135). He never heard braking. (RR VI: 134). In fact, the car was speeding. (RR VI: 158). The car went past Eric, took out a light pole on the sidewalk, and continued back onto Guadalupe Street. (RR VI: 136-137). The car struck two

---

[3] Another witness, David Abeles, described the sound of the car as "unforgettable" and that "it sounded like acceleration going down the sidewalk." (RR VI: 157). John Linam also testified to hearing sounds of acceleration and thinking the driver was trying to get away from the scene. (RR VI: 188). Linam was certain he did not hear braking. (RR VI: 188).

people on the sidewalk, and the male victim landed on the ground in front of Eric. (RR VI: 138).

Michael Webb confronted appellant at the scene when he realized the male victim was dead. (RR VI: 175). She claimed that she hit a pothole[4] or bump, but there were no major potholes on that road. (RR VI: 175; RR VII: 48). Appellant did not seem sober; she was distant and seemed "too drugged up" to care. (RR VI: 181-182).

Sarah Lee Parker went to Wheatsville that fateful evening to grocery shop and see her boyfriend who worked there. (RR VI: 192). After shopping, she approached a crosswalk on the northside of Wheatsville and heard a car crash. (RR VI: 194). Parker then saw a vehicle push another vehicle onto the sidewalk and come toward her. (RR VI: 195). She tried to jump a railing to get to safety, but she was not quick enough. (RR VI: 195-196). The car struck Parker and threw her into the air before she landed on her side on the sidewalk. (RR VI: 196). The car had been driven at an unsafe speed and did not yield to her. (RR VI: 201).

EMS personnel transported Parker to the hospital. (RR VI: 198). When the shock wore off, Parker felt intense pain throughout her body. (RR VI: 199). Parker had suffered a fractured jaw, and her teeth had shifted so that she could not

---

[4] The City of Austin Public Works Department had no reports regarding potholes in February of 2012. (RR VIII: 43).

17

eat solid food for a few months. (RR VI: 199). She also suffered a fractured shoulder, and she loss use of her left arm for a period of time. (RR VI: 199). She had a black eye, lots of bruising, and stitches. (RR VI: 199). At the time of trial some two years later, Parker still had difficulties with her left shoulder. (RR VI: 200).

Allison Uszler ran to appellant's aid after her car hit the pole.[5] (RR VI: 207). Uszler's boyfriend helped pull appellant from the car. (RR VI: 245). Appellant was conscious and said she was fine, but she had a glazed look over her face. (RR VI: 207, 209, 212, 246). Appellant told Uszler that she was a nurse and had come from the hospital, that her car hit a pothole, and that her brakes quit working.[6] (RR VI: 212). Appellant asked Uszler if she needed her (appellant's) insurance, which question made Uszler wonder if appellant knew what had happened. (RR VI: 212-213). Appellant did not smell of alcohol or slur her words, but she seemed slow to react and unaware of what was going on. (RR VI: 217). When appellant saw the male victim on the ground, she had no reaction. (RR VI: 219). Uszler thought appellant's blood should be checked for painkillers. (RR VI: 229).

---

[5] According to Uszler, appellant accelerated the car as she drove toward the pole. (RR VI: 224).

[6] An automotive expert testified that a pothole could not cause a complete mechanical failure of the Lexus brake system. (RR VIII: 30-31).

Appellant refused medical attention against the advice of EMS personnel. (RR VII: 20-21). Appellant had constricted pupils (SX66), which could be a sign of opiate use. (RR VII: 26). But, she denied that she had taken any medications or been drinking. (RR VII: 30). Appellant did not exhibit any of the classic signs of adrenaline rush or anger typically experienced by someone in a stressful event. (RR VII: 42). Appellant actually nodded off[7] a few times while waiting for the DWI Unit to arrive at the scene. (RR VII: 127). Police administered field sobriety tests. Appellant had vertical nystagmus in both eyes, indicating a high dosage of either alcohol or drugs in her system. (RR VIII: 93, 95). After completing the field sobriety tests, the officer concluded appellant was intoxicated by drugs. (RR VIII: 100-101). Appellant also gave a breath sample that was zero for alcohol. (RR VIII: 104). A drug recognition expert evaluated appellant and concluded she was under the influence of narcotic analgesics and a central nervous system depressant. (RR VIII: 130). An opiate is a narcotic analgesic. (RR VIII: 130).

Appellant consented to have her blood drawn. (RR VII: 167; RR VIII: 102; SX123). Analysis of her blood revealed oxycodone[8] at .23 milligrams per liter, significantly above the threshold level of .005. (RR VIII: 192). Appellant's level of Morphine in her blood was below the threshold level. (RR VIII: 194-195).

---

[7] Police refer to the nodding off behavior as "on the nod," which is consistent with the use of drugs as an intoxicant. (RR VIII: 115-116).

[8] Percocet was another name for oxycodone. (RR VIII: 193).

19

A jail nurse sent appellant to Brackenridge Hospital for evaluation of low oxygen saturations. (RR VII: 179). Emergency room charge nurse Adam Pinion conducted appellant's initial assessment, and she told Pinion that she had had a fainting spell earlier in the day and had taken between six and eight Percocet after having been discharged from the hospital that day. (RR VII: 177-179). Pinion testified that a normal dosage is just one to two Percocet, which is an opiate. (RR VII: 183).

**Appellant's Hospitalization at Seton for Fainting**

Hsiumei Wei, a nurse at Seton Hospital, reviewed appellant's medical records during her testimony. Appellant had been admitted to the hospital on February 18, 2012, and complained of head and neck pain, with a pain level of 8 out of 10 at 8:22 p.m. (RR VII: 234). Appellant was given two milligrams of Morphine by IV. (RR VII: 239). At 10:55 p.m., appellant complained of head and neck pain, with the pain at 7 out of 10. (RR VII: 241). The night nurse gave appellant Percocet. (RR VII: 241). At midnight, appellant claimed the Percocet was not providing her relief and that her pain was worse. (RR VII: 241-242). Appellant was again given two milligrams of Morphine. (RR VII: 242). At approximately three in the morning, appellant complained of pain and was again given Percocet. (RR VII: 242). At 4:33 a.m., appellant still complained that her

20

pain had not subsided, and she was given another two milligrams of Morphine. (RR VII: 243).

In the morning when Wei came on duty on February 19, 2012, appellant told Wei that her neck hurt, again with a pain level of 8 out of 10; Wei gave appellant two Percocet. (RR VII: 237, 244). Despite all this pain medication, appellant contended her pain level had not subsided. (RR VII: 245). As soon as appellant swallowed the Percocet that Wei had given her, she asked for a Morphine shot. (RR VII: 247). Appellant later received Morphine at 9:40 a.m. (RR VII: 247).

Appellant still said her pain level was 8 out of 10. (RR VII: 248). Wei called the doctor, Marc Simpao, who increased the dosage and frequency of Morphine.[9] (RR VII: 249). So, at 10:30 a.m., Wei gave appellant four milligrams of Morphine. (RR VII: 250). At noon, appellant said her pain level had increased to 8.5. (RR VII: 251). Wei gave her Percocet. (RR VII: 251). Appellant's last does of painkiller was at 3:00 p.m. when she still complained her pain level was 8 out of 10. (RR VII: 252). Appellant wanted Morphine, and Wei gave her Morphine at that time. (RR VII: 252).

Appellant was discharged from the hospital at 5:00 p.m. on February 20, 2012. (RR VII: 254). As appellant stood at the door, she still had the IV in, and

_____

[9] The initial dosage and frequency of Morphine had been two milligrams every four hours. Because of appellant's continued complaints of pain, that dosage was increased to four milligrams every three hours. (RR VII: 250).

21

she tried to pull it out. (RR VII: 254). Appellant told Wei that she was a nurse and could remove her own IV. (RR VII: 255). Throughout the day, appellant had communicated clearly with Wei and seemed to process information. (RR VII: 256).

Appellant called a taxi from her hospital room to take her home. (RR VII: 259-260). Wei did not think appellant could safely driver herself home. (RR VII: 262). Appellant had told Wei that her pain stemmed from a prior car accident. (RR VII: 263). Appellant's medical chart reflected that she was taking 20 milligrams of Percocet on her own at home. (RR VII: 264).

On cross-examination, Wei testified that no physician instructed her (Wei) that appellant could not drive a car. (RR VII: 267). But, Wei told appellant she should not drive when she discharged her. (RR VII: 268). The routine discharge papers did not reflect an instruction not to drive, but Wei testified that hospital employees will instruct the patient not to drive. (RR VII: 268). Wei confirmed that the neurologist told appellant not to drive. (RR VII: 271, 272). Appellant was also instructed to continue her Percocet at home. (RR VII: 274).

Dr. Sara Austin, a neurologist, saw appellant at Seton Hospital on February 19, 2012, at 4:00 p.m. (RR VII: 284, 287, 290). Her resident, Dr. John Konikkara, saw appellant first on February 18, 2012. (RR VII: 287). The doctors evaluated appellant for a new onset seizure. (RR VII: 288). An MRI of appellant's brain and

22

her EEG both appeared normal. (RR VII: 288). Dr. Austin's medical note indicated that appellant took 20 milligrams of Percocet every four hours, but appellant did not want to disclose the name of her pain management doctor, which Dr. Austin thought was odd and raised a red flag. (RR VII: 292, 307). That a person required narcotics to ease headache pain also raised a concern that the person was looking for narcotics for reasons other than pain. (RR VII: 306). Dr. Austin said a normal dosage of Percocet was one every six hours. (RR VII: 308). She could not imagine prescribing six to eight Percocet for someone over a two-hour timeframe. (RR VII: 309). She noted Percocet slowed a person's physical and mental reaction time and that some people took Percocet just to get high. (RR VII: 309-310).

Dr. Austin thought appellant's cognitive ability was pretty normal; she did not show signs of an extended postictal state. (RR VII: 298-299). Dr. Austin clearly remembered her conversation with appellant informing her not to drive because every state has rules about driving after a seizure. (RR VII: 300-301). Dr. Austin told appellant that driving after a seizure was illegal and that she could be a danger to herself and others. (RR VII: 301). Appellant was told specifically not to drive for six months. (RR VII: 293). Appellant repeatedly asked Dr. Austin how anyone would know that she was not supposed to drive. (RR VII: 301-302). This repeated inquiry angered Dr. Austin. (RR VII: 302). Appellant was belligerent

that no one would know if she drove. (RR VII: 304). Dr. Austin therefore decided to report appellant's driving restriction to DPS in Texas. (RR VII: 293, 302).

Dr. Austin obtained the form to report appellant to DPS on Monday, February 20th, but it was too late. (RR VII: 303). She testified that "there was no question that [appellant] knew that she had been told specifically that she wasn't to drive. She was not safe to drive." (RR VII: 303). Seton Clinical Assistant Kenneth Bee had put appellant in a taxi when she discharged from the hospital. (RR VII: 325).

The medical examiner's report, SX122, was admitted into evidence. (RR VII: 139). Dik van Meerten died as a result of multiple blunt force injuries. (SX122; RR XII: 326).

**Punishment Phase Evidence**

Dik van Meerten's best friend of 46 years, Peter Tainsh, described Van Meerten as boisterous and exuberant, yet very intelligent and thoughtful; he never held a grudge. (RR IX: 97-98). Van Meerten was like family to Tainsh, and they planned that van Meerten would live with Tainsh and his wife for extended periods of time beginning in the summer of 2012 and work remotely, but of course that never happened. (RR IX: 100).

Janet Kahan married van Meerten in 1978 and had twin children in 1980. (RR IX: 101-102). Although they divorced in 1996 or 1997, they stayed

24

connected and valued each other. (RR IX: 105). In fact, they had traveled to Austin together that fateful weekend for a family gathering. (RR IX: 105). Van Meerten was always available to help Kahan and their children, and, with his death, that sense of security was gone for them. (RR IX: 105-106).

On October 4, 2009, Austin Police Officer Darren De Pena responded to a head-to-head collision in Central Austin involving appellant and another driver. (RR IX: 112). The other driver reported that he did not see the appellant's vehicle because appellant was driving without lights. (RR IX: 115). Appellant struck the other driver's vehicle as he attempted to make a left turn into a grocery store. (RR IX: 115).

Jonathan Davis witnessed the accident. (RR IX: 134). He observed appellant's vehicle make a too-wide turn of many car lengths onto 43rd Street and into the lane for oncoming traffic. (RR IX: 135, 136). Appellant's vehicle did not have its lights on. (RR IX: 134). As another driver attempted a left-hand turn into the grocery store, appellant struck it with her vehicle. (RR IX: 135). Davis did not hear the sound of braking. (RR IX: 137). Davis tried to tell appellant that she needed to talk to the driver of the vehicle that she struck, but she was "loopy" and "not having it." (RR IX: 138).

Officer De Pena conducted an intoxication investigation on appellant for this accident because police suspected she was impaired. (RR IX: 114-115). In her

HGN test, appellant had 6 clues of intoxication, three in each eye. (RR IX: 118). In the walk-and-turn test, appellant had six validated clues of intoxication, viz: starting the test before instructed, losing her balance, failing to walk heel to toe, turning improperly, and falling off the line. (RR IX: 119-120). Appellant also failed the one-leg stand, with four validated clues of intoxication. (RR IX: 120-121). Appellant told De Pena that she had taken Percocet earlier in the day, and De Pena opined, based on appellant's performance on the FSTs and that she did not smell of alcohol, that she was intoxicated from medication. (RR IX: 121). Appellant had very constricted pupils, which indicated intoxication by a narcotic analgesic, i.e. a painkiller. (RR IX: 122).

Toxicology tests performed on appellant's blood after this accident revealed she had .12 milligrams of alprazolam, .22 milligrams of oxycodone, and unquantified amounts of metaxalone in her blood. (RR X: 9). Metaxalone was the brand name for a drug called Skelaxin, which was used as a muscle relaxer. (RR X: 9). The amount of oxycodone in appellant's blood was significant and could, alone, produce intoxicating results. (RR X: 9). When appellant killed Van Meerten and seriously injured Parker, her oxycodone level was similar at .23 milligrams. (RR X: 10). Moreover, a therapeutic does of alprazolam was generally only .02 to .06 milligrams. (RR X: 11).

A DWI prosecution for this accident was dismissed (SX139), and appellant was placed on community supervision for obstructing a highway in 2010. (SX139; RR XII: 414). Appellant was discharged from this community supervision a year later. (RR XII: 417).

Other evidence established that appellant had been hospitalized on April 17, 2009, for a potential overdose of OxyContin. (RR X: 43). In February of 2012, appellant's prescription for Percocet was for 150 ten-milligram tablets a month, i.e. five a day. (RR X: 48). Per a narcotics contract, which appellant had, a patient was informed not to drive or use heavy equipment until they saw how the narcotic affected them. (RR X: 49). Also, appellant's nursing license was suspended from February of 1979 to May of 1979 for intemperate use of drugs and unprofessional and dishonorable conduct. (RR X: 41; RR XII: 383; SX137). Appellant's history of drug abuse clearly predated car wrecks in the late 1980s, for which she took pain medicine. (RR X: 35-37).

Finally, the six to eight Percocet that appellant reported taking prior to the accident killing van Meerten and seriously injuring Parker was 3 to 4 times a single dose. (RR X: 52).

## STATE'S REPLY TO APPELLANT'S FIRST POINT OF ERROR

**Appellant failed to preserve any alleged error for review on her motions for continuance. Appellant's first motion was written but not sworn as required by Art. 29.08, V.A.C.C.P., and appellant's second motion was oral and unsworn. Alternatively, the trial court did not abuse its discretion in denying appellant's motion for continuance.**

**Relevant Facts**

On the morning of Wednesday, August 20, 2014, the trial court considered appellant's written motion for continuance, which appellant filed August 19, 2014. (CR 66-69; RR III: 5, 17). In her motion, appellant requested more time to "digest newly provided discovery." (CR 69). At the hearing, appellant addressed the subject matter of the continuance motion, viz: 1095 pages of medical records from Seton Hospital that were tendered to appellant on Monday of that week.[10] (RR III: 6).

The State informed the court that it had just received these documents the prior Thursday or Friday and acknowledged that the document had been tendered to the defense on Monday. (RR III: 6-7). The State added that, most importantly, these records were *appellant's* medical records and, as such, were available to her anytime she filed a release with the hospital for them. (RR III: 7). Discussion on the record reflects that Judge Brown, the sitting judge of the 147th District Court,

---

[10] That Monday was August 18, 2014.

28

signed a *defense* subpoena for these very records on Friday, and the visiting judge hearing the case had resigned the subpoena this week. (RR III: 11).

Additionally, the State noted that, under the facts of this case, these medical records were actually favorable to the State as the records reflected the appellant's long history of drug abuse. (RR III: 9). And, for that reason, appellant's defense counsel had been strategic in not seeking these records. (RR III: 8-9). According to the prosecutor, the records would aid the State in its cross-examination of the defense experts, which defense counsel represented would be ready for trial. (RR III: 9). The State noted that in many conversations with the State, the defense indicated that its defense in this case would claim that Seton Hospital's conduct in administering drugs to appellant mitigated or legally excused her actions. (RR III: 8).

The trial judge reviewed *in camera* the sealed exhibit attached to appellant's motion for continuance. (RR III: 10, 12). The judge did not surrender the sealed information to the State, but filed it as part of the record as Court's Exhibit 1 attached to the appellant's motion for continuance. (RR III: 12). The trial judge denied the appellant's motion for continuance. (RR III: 12).

On Monday, August 25, 2014, appellant raised another continuance issue regarding evidence from the hospital. (RR V: 4). Appellant told the court that on the previous Thursday she had received a document from the State called the

patient safety event case review form. (RR V: 4-5). Appellant acknowledged that this document had not been in the State's possession, and she did not allege bad faith except on the part of Seton Hospital. (RR V: 4-5). This form, dated February 21, 2012, concerned an investigation by Seton Hospital of any accidents as a result of appellant's treatment at the hospital. (RR V: 5-7). On page three, the form affirmatively reflected a deviation from generally accepted performance standards. (RR V: 7). Appellant claimed the hospital should have been indicted like she was. (RR V: 7).

In response to the court's inquiry regarding the form's relevance, appellant contended that via this form the hospital admitted that it had discharged an intoxicated patient who was then involved in an accident. (RR V: 8). The appellant argued that the accident was secondary to the hospital's administration of Morphine and Percocet to her. (RR V: 8). The State concurred that that issue was not disputed. (RR V: 8). The State added that appellant had known the drug levels that were administered to her and that the investigatory form was a secondary record based upon records that had been tendered to defense counsel well in advance of trial. (RR V: 8). The State asserted that the data underlying the investigatory report had all been disclosed to defense counsel during discovery, except for the fact that a person named Kenny Bee actually put appellant in a taxi. (RR V: 12). The State provided notice of Bee's existence to defense counsel and

30

tendered a copy of the State's notes from the interview with Bee to defense counsel in advance of trial. (RR V: 12).

The medical records did not contain an admission of liability from the hospital. (RR V: 13). The State informed the court that the defense had had "quite some time" to know that the nurse, Hsiumei Wei, did not note in the records that she had instructed appellant not to drive. (RR V: 14). The patient safety event case review form reflected that Wei's nursing notes did not note that she had instructed appellant not to drive. (RR V: 14).

Appellant argued that the form was "pure *Brady*, and we don't know what it means because we don't have the notes that support it." (RR V: 15). The State countered that whether Seton Hospital concluded it bore some fault was not relevant to whether appellant caused the offense in this case. (RR V: 20). Based on factual proffers by both parties, the trial judge concluded that the information that appellant had received was exculpatory and mitigating evidence and was consistent with conclusions appellant had reached from the medical records. (RR V: 28). The trial judge concluded there was no harm in denying appellant's motion for continuance, and this oral motion was denied. (RR V: 28).

Defense counsel then claimed that he and his co-counsel were going to be rendered ineffective by the court's ruling because they could not adequately prepare a defense. (RR V: 29). In response, the trial judge stated for the record

31

that the information was consistent with information previously received by defense counsel and was consistent with the defensive theory of the case. (RR V: 30). The trial judge did not anticipate that the information would be admissible, but he noted that the report's conclusion appeared to be based on information in the medical records. (RR V: 30). The court ordered that the person who made the report be made available for trial. (RR V: 30).

Prior to trial, the State informed the court that several witnesses from Seton Hospital were present and available to testify, viz: the lady who prepared the report, the lawyer representing Seton, and a woman from risk management with knowledge regarding the policies, procedures, and practices regarding the report. (RR VI: 10). The court directed the parties to speak to these witnesses during the morning and noon recesses. (RR VI: 11). Both sides announced ready for trial. (RR VI: 15).

During the morning recess, the trial judge called witnesses Ida Murguia, the lawyer for Seton Hospital, and Karen Brinkman, who prepared the report, to the bench. (RR VI: 74). Defense counsel proffered the questions and/or issues it wanted to address with Brinkman. (RR VI: 76). Brinkman indicated that she could answer defense counsel's questions, and the court instructed them to do that during lunch. (RR VI: 76-77). Murguia stated for the record that the hospital had responded to the subpoena and immediately provided the requested information

32

once the hospital obtained the protective order for the hospital committee information. (RR VI: 79-80). The trial court confirmed that Murguia's statement was factually accurate. (RR VI: 80).

During its case-in-chief, the State called Valerie Morris to testify regarding the patient safety review form. (RR VIII: 142). Appellant immediately requested to take her on voir dire. (RR VIII: 142). Morris assisted in preparing SX133, and she was prepared to testify that a part of that report was inaccurate. (RR VIII: 144). The trial court overruled appellant's hearsay objection to her testimony. (RR VIII: 148).

In the jury's presence, Morris testified that she began investigating appellant's care at Seton Hospital after she heard about appellant's accident. (RR VIII: 151). Morris reviewed appellant's medical record and put notes in a template used for a possible serious safety event. (RR VIII: 153-154). Morris sent her form to Karen Brinkman in risk management. (RR VIII: 159). A hospital review team, including Morris and Brinkman, determined Seton had followed its standard of care in regard to appellant. (RR VIII: 161). If the team had determined that a serious safety event had occurred, i.e. that Seton did not maintain its standard of care and harm resulted, Morris would have completed the remainder of the form. (RR VIII: 166). State's exhibit 133, the patient safety event case review form in this case, bore an "x" next to a box indicating that Seton had deviated from its

33

standard of care, but Morris testified that that was an error. (RR VIII: 171-172). The "x" resulted from the previous patient upon which Morris had used the template, which Morris failed to erase in preparing the form in this case. (RR VIII: 172). At the close of the evidence, the parties stipulated that SX133 was tendered to the State on August 21, 2014. (RR IX: 18).

**Requisites for a Motion for Continuance and Failure to Preserve Error**

Article 29.03 of the Code of Criminal Procedure provides in part that "A criminal action may be continued on the written motion of the State or of the defendant, upon sufficient cause shown; which cause shall be fully set forth in the motion." Article 29.08 of the Code of Criminal Procedure provides "All motions for continuance must be sworn to by a person having personal knowledge of the facts relied on for the continuance." The Court of Criminal Appeals has construed these statutes to require a sworn written motion to preserve appellate review from a trial judge's denial of a motion for a continuance. *Anderson v. State*, 301 S.W.3d 276, 279 (Tex.Crim.App. 2009), and cases cited therein. The Court interprets this to mean that "if a party makes an unsworn oral motion for a continuance and the trial judge denies it, the party forfeits the right to complain about the judge's ruling on appeal." *Blackshear v. State*, 385 S.W.3d 589, 591 (Tex.Crim.App. 2012), quoting *Anderson,* 301 S.W.3d at 279. Ultimately, an unsworn oral motion preserves nothing for appeal. *Blackshear*, 385 S.W.3d at 591.

34

Appellant presented two different motions for continuance to the trial court, one written and one oral. But, neither motion preserved alleged error for review. Appellant filed her written motion for continuance on August 19, 2014. (CR 66). The basis for this continuance motion was the recent discovery of the 1095 pages of appellant's own medical records. (CR 69). The trial judge heard this motion and denied it on August 20, 2014. (RR III: 12). Yet, alleged error is not preserved for review because this motion was not properly sworn, as required by Art. 29.08. Although defense counsel signed the motion with the language "the above facts sworn to by as true based upon information and belief," no oath or affidavit accompanied the signature. Nor was the motion notarized. *See e.g. Glover v. State*, 2004 Tex. App. LEXIS 4889 (Tex.App. – Houston [14th Dist.] 2004, pet.dism'd.) (not designated for publication) (nothing preserved for review where verification signed but not notarized). The State submits that the motion was therefore not properly sworn as required by Art. 29.03, and nothing is preserved for appellate review. *See Anderson*, 301 S.W.3d at 279; *Williams v. State*, 356 S.W.3d 508, 521 (Tex.App. – Texarkana 2011, pet.ref'd.) (no error preserved for review where motion signed by defendant and counsel but not sworn to); *Johnson v. State*, 257 S.W.3d 778, 781 (Tex.App. – Texarkana 2008, pet.ref'd.) (motion in writing, but not sworn waives error).

Appellant presented a second, oral motion for continuance to the trial court on August 25, 2014.[11] (RR V: 4). This motion concerned the case review form from Seton Hospital, which issue arose after the denial of the first, written motion for continuance. (RR V: 4). The trial judge also denied this oral motion for continuance. (RR V: 28). Because appellant's second motion for continuance was neither written, nor sworn, no alleged error is preserved for review. *Blackshear*, 385 S.W.3d at 591 (an unsworn oral motion preserves nothing for appeal).

Appellant's first point of error should be overruled on procedural default grounds.

**Standard of Review if Alleged Error Preserved for Review**

An appellate court reviews a trial court's ruling on a motion for continuance for an abuse of discretion. *Gallo v. State*, 239 S.W.3d 757, 764 (Tex.Crim.App. 2007). To establish an abuse of discretion, an appellant must show she was actually prejudiced by the denial of her motion. *Id.* Speculation will not suffice to obtain a reversal of a trial court's failure to grant a continuance. *Renteria v. State*, 206 S.W.3d 689, 702 (Tex.Crim.App. 2006). In determining whether a trial court erred in overruling a motion for continuance, the appellate court examines the

---

[11] In her brief at p. 21, appellant contends she "reurged" her motion for continuance at this time. Yet, the record reflects that counsel expressly acknowledged and respected the trial court's previous ruling on that motion. (RR V: 4). Appellant then presented a new issue to support her request for a continuance. This newly asserted basis was not "fully set forth in the motion[,]" as required by Art. 29.03, and therefore was not a basis of the written motion that appellant filed.

36

record of the proceedings to determine if appellant was ably represented by counsel throughout the trial. *Kopanski v. State*, 713 S.W.2d 188, 189 (Tex.App. – Corpus Christi 1986, no pet.). A bare assertion that defense counsel did not have sufficient time to interview the State's potential witness does not alone establish prejudice. *Gallo*, 239 S.W.3d at 764, citing *Heiselbetz v. State*, 906 S.W.2d 500, 512 (Tex.Crim.App. 1995).

Appellant presents a single point of error addressing the denial of both the written and oral motions for continuance.

As for the written motion for continuance, appellant contends that she did not have adequate time to prepare her defense in response to allegedly newly disclosed information in the medical records that she was told not to drive. Appellant refers to the final progress note from Dr. Konikkara that was contained in appellant's personal medical records.

The record reflects that on August 20, 2013, about a year before trial, the State provided discovery of 105 pages of appellant's medical records from Seton Medical Center, under affidavit of Guadalupe Santana. (Supp.CR 20). The State's Notice of Filing Records states "[t]he records will not be filed with the clerk due to privacy concerns, but a true and correct copy of said records is available at the District Attorney's Office for counsel for the Defendant to review. Additionally, the defense attorney, Joe James Sawyer, subpoenaed and was given

an accurate copy of the medical records of Linda Woodman." (Supp.CR 20). These records contain progress notes from Dr. Austin, which reflect that appellant "was told specifically not to drive for 6 months." (Supp.RR: 291).[12] These records were filed under the initial indictment in this cause, D-1-DC-12-200866, which were transferred to this re-indicted cause on August 11, 2014. (Supp.CR 42). Defense counsel was thus made aware approximately one year before trial that appellant had been advised not to drive upon her discharge from the hospital.

Additional evidence supporting that appellant had been told not to drive includes the fact that appellant was not allowed to drive home upon being discharged from the hospital. And, defense counsel knew before trial that nurse Wei had failed to include in her notes that appellant had been advised not to drive. While Dr. Konikkara's final report reflecting the admonition from Dr. Austin was not produced until August 18, 2014, earlier disclosed records stated that medical personnel had advised appellant not to drive. The trial court did not abuse its discretion in denying appellant's motion for continuance on this ground.

As for the oral motion for continuance, appellant refers to the discovery of the Patient Safety Event document, SX133, which mistakenly reflected a deviation from generally accepted standards of care. Appellant contends that she was not

---

[12] These records were admitted at trial as SX121 (RR VII: 7).

able to incorporate this document into her defense that the hospital failed to instruct her to not drive upon discharge from the hospital.

The record reflects that the State disclosed this document to the defense on the same day the State received it. (RR IX: 18). Prior to trial on the merits, the State produced several witnesses from Seton Hospital to testify in regard to SX133. (RR VI: 10). The trial court instructed the parties to speak with these witnesses during the morning and noon recesses of trial, and appellant did not object. (RR VI: 11). In fact, appellant announced ready for trial. (RR VI: 15).

During the morning recess, appellant was able to proffer questions and issues to Ida Murguia and Karen Brinkman, and the witnesses were able to answer appellant's queries. (RR VI: 74-80). Appellant was also able to question Valerie Morris, who prepared SX133, on voir dire prior to her trial testimony, (RR VIII: 142-148), and appellant vigorously cross-examined Morris during her testimony. (RR VIII: 173-185). The record reflects that appellant was ably represented by counsel throughout the trial. *Kopanski*, 713 S.W.2d 189.

Appellant contends she was prejudiced by the late discovery of SX133 because she was not able to employ an expert in hospital administration to explain the meaning of the document. Appellant's brief at p. 25. This bare assertion is insufficient to establish prejudice. *Gallo*, 239 S.W.3d at 764 (assertion of insufficient time to interview witnesses does not alone establish prejudice).

39

Moreover, three hospital employees were available at trial, and one testified to these specific issues. Appellant did not call either Murguia, Brinkman, or Morris as a witness in her defense.

The trial court did not abuse its discretion in denying appellant's oral motion for continuance, and this point of error should be overruled.

## STATE'S REPLY TO APPELLANT'S SECOND POINT OF ERROR

**The trial court did not err in refusing appellant's requested instruction on involuntary intoxication. Alternatively, assuming any alleged error, appellant did not suffer any harm.**

Appellant requested an instruction on involuntary intoxication in the court's charge at guilt/innocence. (RR IX: 7). Appellant based her request on a concurring opinion in *Farmer v. State*, 411 S.W.3d 901 (Tex.Crim.App. 2013). (RR IX: 24). The State objected to the requested charge, noting the evidence did not support it. (RR IX: 25-26). The State cited *Rogers v. State*[13] in support of its objection. (RR IX: 27). The court granted the State's objection to appellant's requested charge. (RR IX: 33, 34). Appellant also argued that the trial court unfairly commented on the weight of the evidence by including an instruction on voluntary intoxication but denying an instruction on involuntary intoxication. (RR IX: 37-38). The trial court overruled that objection. (RR IV: 38).

---

[13] The record does not reflect the full cite for *Rogers v. State*, but it appears the State referred to *Rogers v. State*, 105 S.W.3d 630 (Tex.Crim.App. 2003), which the Court discussed in *Farmer*, 411 S.W.3d at 905.

In this point of error, appellant argues that the involuntary intoxication was raised by the evidence that she was given both Percocet and Morphine while hospitalized for the seizure. Appellant seems to argue that the mere fact of a prescribed medication raises the affirmative defense of involuntary intoxication. *See* appellant's brief at p. 30. The State submits appellant was not entitled to the instruction, as the evidence showed she voluntarily ingested multiple painkillers.

**Standard of Review for Alleged Jury Charge Error**

The appellate court's first duty in analyzing a jury charge issue is to decide whether error exists. *Ngo v. State*, 175 S.W.3d 738, 743-44 (Tex.Crim.App. 2005). Then, if the reviewing court finds error, the court analyzes that error for harm. *Middleton v. State*, 125 S.W.3d 450, 453 (Tex.Crim.App. 2003). Preservation of charge error does not become an issue until the appellate court assesses harm. *Id.* at 453. The degree of harm necessary for reversal depends on whether the appellant preserved the error by objection. *Id.* Jury charge error requires reversal when the defendant has properly objected to the charge and the reviewing court finds "some harm" to his rights. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App. 1985). When the defendant fails to object or states that he has no objection to the charge, the appellate court will not reverse for jury charge error unless the record shows "egregious harm" to the defendant. *Ngo*, 175 S.W.3d at 744; *Almanza*, 686 S.W.2d at 171. Thus, the appellate court reviews alleged

41

charge error by considering two questions: (1) whether error existed in the charge; and (2) whether sufficient harm resulted from the error to compel reversal. *Posey v. State*, 966 S.W.2d 57, 60 n.5 (Tex.Crim.App. 1998).

**Involuntary Intoxication Defense**

Texas recognizes an affirmative defense of involuntary intoxication. V.T.C.A. Penal Code §8.01(a). Involuntary intoxication is a defense to criminal culpability when it is shown that: (1) the accused has exercised no independent judgment or volition in taking the intoxicant; and (2) as a result of his intoxication, the accused did not know that her conduct was wrong or was incapable of conforming her conduct to the requirement of the law he allegedly violated. *Mendenhall v. State*, 77 S.W.3d 815, 817 (Tex.Crim.App. 2002); *Torres v. State*, 585 S.W.2d 746, 749 (Tex.Crim.App. 1979); *Aliff v. State*, 955 S.W.2d 891, 893 (Tex.App. - El Paso 1997, no pet.). Involuntary intoxication by prescription medication occurs only "if the individual had no knowledge of possible intoxicating side effects of the drug, since independent judgment is exercised in taking the drug as medicine, not as an intoxicant." *Nelson v. State*, 149 S.W.3d 206, 210 (Tex.App. – Fort Worth 2004, no pet.). The involuntary conduct defense is available to a defendant if the evidence shows a third person caused the accused to become intoxicated, such as slipping a "mickie" in her drink or forcing her to take an intoxicant and get behind the wheel. *Farmer*, 411 S.W.3d at 907, n.9,

citing *Torres v. State*, 585 S.W.2d 746, 748 (Tex.Crim.App. [Panel Op.] 1979) (holding that the defendant was entitled to a jury charge instruction on involuntary intoxication because there was evidence that the defendant "did not know that any intoxicant [e.g., thorazine] was included in the preparation she drank. Although she voluntarily drank the preparation, unless she knew it contained the drug her actions were not a volitional consumption of the intoxicant"). Conduct is not rendered involuntary merely because an accused does not intend the result of his conduct. *Rogers v. State*, 105 S.W.3d 630, 638 (Tex.Crim.App. 2003), quoting *Adanandus v. State*, 866 S.W.2d 210, 230 (Tex.Crim.App. 1993).

**The Evidence Did Not Raise Involuntary Intoxication**

The evidence showed appellant was voluntarily intoxicated. At Seton hospital after her fainting spell, appellant repeatedly asked for the pain medicines Morphine and Percocet, one after another. Appellant was not forced to take them, nor were they given to her unknowingly. Also, after this offense, appellant admitted that she took between six and eight Percocet **after having been released from Seton hospital**. (RR VII: 177-179). This medication she took on her own. And, evidence showed that appellant routinely took Percocet every four hours for pain. (RR VII: 292, 307). Appellant's repeated taking of the pain medications was

a voluntary act, as was her driving of the car.[14] *See Farmer*, 411 S.W.3d at 908.

Hence, she was not entitled to an instruction on involuntary intoxication, and the

trial judge did not err in denying her requested instruction.

Moreover, because the evidence at trial raised the issue of voluntary

intoxication, the trial judge correctly instructed the jury on that issue as it was the

law applicable to the case. *Sakil v. State*, 287 S.W.3d 23, 28 (Tex.Crim.App.

2009). Article 36.14 of the Code of Criminal Procedure mandates that a trial court

submit a charge setting forth the law applicable to the case. *Posey v. State*, 966

S.W.2d 57, 62 (Tex.Crim.App. 1998). The trial judge set forth the law applicable

to this case by tracking the language of Penal Code §§8.04(a) and (d). Thus, it was

not an improper comment on the weight of the evidence. *See Casey v. State*, 215

S.W.3d 870, 886 (Tex.Crim.App. 2007).

*Farmer*, 411 S.W.3d 901, does not support appellant's argument in this

point of error. The issue in *Farmer* was whether there was sufficient evidence

adduced at trial to entitle Farmer to a jury charge instruction on voluntariness. 411

S.W.3d at 902. Farmer argued that he was entitled to the instruction because

evidence showed he had mistakenly taken the wrong prescription medicine. The

Court of Criminal Appeals concluded that the trial court properly denied the

---

[14] The State notes that involuntary intoxication is not a defense to driving while intoxicated, and a trial court does not err in refusing an involuntary intoxication instruction in a DWI case. *Brown v. State*, 290 S.W.3d 247, 251 (Tex.App. – Fort Worth 2009, pet.ref'd.).

requested instruction because Farmer's action in taking the wrong prescription medicine was a voluntary act, i.e., of his own volition, he picked up and ingested the medication. 411 S.W.3d at 908. The same is true in this cause, viz: of her own volition, appellant repeatedly ingested the painkillers before, during, and after her hospitalization and before this offense. Appellant, therefore, was not entitled to an instruction on involuntary intoxication, and the trial court did not err in refusing appellant's requested instruction.

**Assuming the Trial Court Erred, Appellant Suffered No Harm**

In her jury argument, appellant noted the instruction on voluntary intoxication, but then stated that "frankly, though, this was involuntary intoxication." (RR IX: 75). Appellant argued that the jury could find her not guilty on that basis. (RR IX: 75).[15] So, although an involuntary intoxication instruction was not included in the charge, the appellant presented it to the jury in her argument. Furthermore, the defense faulted the hospital for discharging an intoxicated appellant, and argued that appellant was confused due to the seizure she had suffered, had been in a postictal state, and suffered another seizure when she was driving (RR IX: 70). Appellant was therefore able to present her involuntariness argument to the jury and suffered no harm.

Appellant's second point of error should be overruled.

---

[15] The State did not object to appellant's argument.

**STATE'S REPLY TO APPELLANT'S THIRD POINT OF ERROR**

**The trial court did not deny appellant a hearing on her motion for new trial. The trial court did not abuse its discretion in its conduct of the evidentiary hearing on appellant's motion for new trial as appellant was not entitled to present live testimony at the hearing per Rule 21.7. Additionally, the trial court correctly determined that a visit to the crime scene was not an "outside influence" and that Rule 606(b) did not allow for any further inquiry. Assuming any alleged error, it had no impact on the hypothetical average juror.**

**Relevant Facts**

On September 23, 2014, appellant filed a motion for new trial alleging, *inter alia*, juror misconduct. (CR 127). The basis of the alleged juror misconduct was juror Darnell visiting the crime scene after the verdict at guilt/innocence but before the punishment verdict. (RR XI: 5). The State subsequently took an audiotaped statement from the juror and forwarded a copy to both appellant and the trial court. (RR XI: 5). The record reflects that the trial judge thereafter convened the parties in his chambers and decided to let them argue whether testimony was needed via a hearing in court. (RR XI: 5-6).

Appellant argued that a hearing was appropriate to explore the juror misconduct and that Rule 606(b) did not prohibit such an inquiry. (RR XI: 8-9). The State countered that Rule 606(b) allowed for evidence in the form of an affidavit. (RR XI: 10). Relying on *McQuarrie v. State*, 380 S.W.3d 145, 153 (Tex.Crim.App. 2012), the State argued that the Rule 606(b) inquiry was limited to

that which occurred outside the jury room and outside of the juror's personal knowledge and experience. (RR XI: 10). The State noted that the crime scene was an area to which the juror had been to many times before and, therefore, it was not outside of her personal experience. (RR XI: 10).

The trial court found that this case was significantly distinguishable from *McQuarrie* on its facts and that the Court of Criminal Appeals clearly addressed the issue of an outside influence in that case. (RR XI: 14). The trial court further found that juror Darnell's visit to the crime scene did not constitute an outside influence under a *McQuarrie* analysis. (RR XI: 15).

Appellant respectfully dissented and argued that she needed to question juror Darnell about her motivation for going to the crime scene. (RR XI: 15). Appellant did not debate what was on the audiotape, but she wanted to explore why Darnell's punishment decision went from probation to twenty years, along with the rest of the jury. (RR XI: 16). The trial court responded and assumed for the sake of argument that the visit to the crime scene was a "communication." (RR XI: 16). The trial court added that the only inquiry to be made then was whether the crime scene visit had an impact on the jury's ultimate decision on punishment, a jump the trial court could not make. (RR XI: 16).

The trial judge added that he had listened to the audiotape of juror Darnell, and he did not think the State's questions to her were leading. (RR XI: 17-18). The

47

trial judge reiterated that he did not think the visit to the crime scene was an outside influence under *McQuarrie*, and with that determination, there was no further inquiry to be made.  (RR XI: 17, 18). The trial judge concluded that there was no need for any **further** testimony or affidavits.  (RR XI: 18).  Based on his analysis, the trial court denied appellant's motion for new trial.  (RR XI: 18).

**Standard of Review on Trial Court's Decision to Conduct a Motion for New Trial Hearing**

The appellate court reviews a trial court's decision not to conduct a hearing on a motion for new trial for an abuse of discretion.  *Smith v. State*, 286 S.W.3d 333, 340 (Tex.Crim.App. 2009).  A trial court abuses its discretion in failing to hold a hearing when a defendant presents a motion for new trial raising matters not determinable from the record.  *Holden v. State*, 201 S.W.3d 761, 763 (Tex.Crim.App. 2006).  But, a trial court may rule based on sworn pleadings and affidavits without oral testimony; live testimony is not required. *Id.*, citing *Rivera v. State*, 89 S.W.3d 55, 58-9 n.9 (Tex.Crim.App. 2002).  Texas Rule of Appellate Procedure 21.7 provides "[t]he court may receive evidence by affidavit or otherwise."  "It has long been held that a trial court may decide a motion for new trial based on sworn pleadings and affidavits admitted in evidence without hearing oral testimony."  *Holden*, 201 S.W.3d at 763, quoting *Skaggs v. State*, 18 S.W.3d 277, 281 (Tex.App. – Austin 2003, pet.ref'd.).  Affidavits not formally admitted into evidence but treated by the parties as if they had been offered in evidence are

48

deemed admitted. *Scott v. State*, 419 S.W.3d 698, 700 n.1 (Tex.App. – Texarkana 2013, no pet.), and cases cited therein.

**The Trial Court Conducted a Hearing on Appellant's Motion for New Trial**

The trial court in fact held a hearing on appellant's motion for new trial, and appellant acknowledges that fact in her brief. At p. 43, appellant states that she "**presented evidence** in her motion for new trial and **at the setting before the court** that showed the juror had visited the crime scene during the pendency of the trial." (emphasis added). Indeed, the record reflects that the trial judge listened to and considered the audiotape of juror Darnell and heard argument from the parties during this hearing. *See Scott*, 419 S.W.3d at 700. Appellant did not debate what juror Darnell stated in her audiotape. (RR XI: 16).

Appellant's sole complaint on appeal is that she was not allowed to present live testimony from the juror at this hearing to fully "explore" what the juror said. *See* (RR XI: 16). Appellant wanted to explore how juror Darnell reached her decision on punishment. (RR XI: 16). In this point of error, appellant seeks only an abatement for an evidentiary hearing on the motion for new trial with live testimony.

The record reflects that the trial court conducted an evidentiary hearing on the motion for new trial, and, in that hearing, he considered the facts in appellant's motion and accompanying defense counsel's affidavit, the audiotape, and the

parties' arguments. The trial court just did not conduct the hearing in the manner in which appellant wanted, i.e. with live testimony. By its express terms, Rule 21.7 did not entitle appellant to present live testimony. Thus, the trial court did not abuse its discretion in refusing live testimony on the motion. And, appellant did not offer Darnell's testimony via an affidavit, as allowed by Rule 21.7, or evidence from any other juror that Darnell relayed information about the crime scene to the rest of the jury. *See e.g. McQuarrie*, 380 S.W.3d at 148 (defendant offered affidavits of two jurors at the hearing that a third juror had researched effects of date rape drug, relayed that information to rest of the jury, and information changed the mind of two jurors on guilt/innocence).

Because appellant has had a hearing on her motion for new trial and she does not contend that the trial court abused its discretion in denying her motion for new trial, this point of error should be overruled. [16]

**Alternatively, Rule 606(b) Prohibited Further Inquiry**

Texas Rule of Evidence 606(b) prohibits a juror from testifying about "any matter or statement occurring during the jury's deliberations," with two exceptions. *McQuarrie*, 380 S.W.3d at 150. "A juror may testify about 'whether any outside

---

[16] The trial court's refusal to allow live testimony on the motion for new trial may be upheld for this reason. *See Prystash v. State*, 3 S.W.3d 522, 527 (Tex.Crim.App. 1999), *cert.denied* 529 U.S. 1102 (2000) (if trial court's decision was correct on any theory of law applicable to the case, the appellate court will sustain it). This is true even if the trial judge failed to give any reason or used the wrong reason for the ruling. *Id.*, citing *Romero v. State*, 800 S.W.2d 539, 543 (Tex.Crim.App. 1990).

influence was improperly brought to bear upon any juror' or 'to rebut a claim that the juror was not qualified to serve.'" *Id.* The purpose of the first exception is to allow proof of external pressures that are likely to affect the verdict.[17] *Colyer v. State*, 428 S.W.3d 117, 124 (Tex.Crim.App. 2014).

The Court of Criminal Appeals has recognized that an "outside influence" is something outside of both the jury room and the juror. *White v. State*, 225 S.W.3d 571, 574 (Tex.Crim.App. 2007). A Rule 606(b) inquiry is limited to that which occurs outside of the jury room and outside of the juror's personal knowledge and experience. *McQuarrie*, 380 S.W.3d at 153. The trial court may not delve into deliberations or inquire as to the subjective thought processes and reactions of the jury. *Id.*

In *Colyer*, the Court of Criminal Appeals noted that typical situations in which juror testimony is allowed as an "outside influence" under the corresponding federal evidentiary rule are threats, bribes, communications with court personnel, and assaults upon a jury member. 428 S.W.3d at 125. Texas courts have interpreted "outside influence" to include factual or legal information conveyed to the jurors by a bailiff or some other unauthorized person who intends to affect the deliberations. *Id.*, citing *Soliz v. State*, 779 S.W.2d 929, 932 (Tex.App. – Corpus Christi 1989, no pet.) ("To constitute 'outside influence,' the source of the

---

[17] As in *McQuarrie*, the latter exception is not relevant in this case.

51

information must be one who is outside the jury, i.e. a non-juror, who introduces the information to affect the jury's verdict.") (emphasis deleted). The "outside influence" exception does not include influences such as coercion by a fellow juror or the discussion of a juror's own personal knowledge. *Colyer*, 428 S.W.3d at 125.

**The Trial Court Correctly Determined that the Juror's Visit to the Crime Scene was not an "Outside Influence"**

In *McQuarrie*, the appellate court determined that an internet research conducted by a juror about the effects of date rape drugs constituted an "outside influence." 380 S.W.3d at 154. The court noted that the internet research occurred outside of the jury room and outside of deliberations, as the juror conducted a private investigation at her home during an overnight break. *Id.* The information obtained by the juror originated from a source on the internet, **"a source other than the jurors themselves."** *Id.* (emphasis added). The court stated "[t]he internet research constituted an 'outside influence.'" *Id.*

As the trial court correctly noted, the facts in this cause are significantly different than the facts in *McQuarrie*. (RR XI: 14). In *McQuarrie*, the defendant was charged with sexual assault. Testimony suggested that the victim could have possibly been drugged. During a break in jury deliberations, when the jury was split 9-3 in favor of guilt, a juror researched on the internet the effects of date rape drugs, when such evidence had not been admitted at trial. The internet search constituted an outside influence.

52

Here, the jury had already returned a verdict at guilt/innocence, and the jury was not in deliberations when juror Darnell visited the crime scene. The crime scene was a public place, not an outside reference or source. Additionally, the State had introduced substantial evidence regarding the extent of the crime scene with testimony from multiple witnesses, a diagram, and more than 50 photographs. In *McQuarrie*, the juror obtained information from an unknown, outside resource on the internet. Here, any information juror Darnell obtained from her crime scene visit was not outside of her personal knowledge and experience. *McQuarrie*, 380 S.W.3d at 153. Thus, it was not an "outside influence," and the trial court did not abuse its discretion in denying inquiry under Rule 606(b).

Also, Rule 606(b) prohibits appellant's requested inquiry into how Darnell reached her punishment verdict. Rule 606(b) prevents a juror from testifying that the jury discussed improper matters *during deliberation. McQuarrie*, 380 S.W.3d at 151 (emphasis in original), citing *Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362, 372 (Tex. 2000). The trial court may not delve into deliberations or inquire as to the subjective thought processes and reactions of the jury. *McQuarrie*, 380 S.W.3d at 153. Thus, appellant could not query juror Darnell on her thought processes in reaching her punishment verdict because Rule 606(b) prohibits such an inquiry. *Colyer*, 428 S.W.3d at 129 (juror may not testify about the effect that the information from an outside influence had on the jury). The trial

court did not abuse its discretion in preventing this inquiry of juror Darnell in the motion for new trial hearing.

Lastly, a trial court has wide discretion in its decision to admit or exclude evidence. *Biagas v. State*, 177 S.W.3d 161, 172 (Tex.App. – Houston [1st Dist.] 2005, pet. ref'd.). Appellant's request to question juror Darnell about her motivation for visiting the crime scene and explore that issue more fully was vague and not a relevant inquiry under Rule 606(b). The trial court's decision to not allow such inquiries was within the reasonable zone of reasonable disagreement and should not be disturbed on appeal. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App. 1990).

**Assuming the Crime Scene Visit Constituted an Outside Influence, It had No Impact on the Verdict**

Upon a finding of an outside influence, the trial court is to make an objective determination as to whether the outside influence likely resulted in injury to the complaining party. *McQuarrie*, 380 S.W.3d at 154. The trial court makes this determination by limiting the questions asked of the jurors to the nature of the unauthorized information or communication and then conducting an objective analysis to determine whether there is a reasonable probability that it had a prejudicial effect on the "hypothetical average juror." *Id.*

The trial court assumed for argument's sake that Darnell's visit to the crime scene constituted a "communication." (RR XI: 16). The trial court found that it

54

could have had no impact on the verdict. (RR XI: 16). The crime scene was a public area, in a busy shopping district near the University of Texas campus, with which Darnell was familiar. Additionally, the State introduced approximately 50 photographs of the crime scene and a diagram. Testimony established that the crime scene was approximately 350 yards in length, from appellant's initial impact with the white BMW until she collided into the pole near the cleaners and was finally stopped. (RR VI: 68; RR VII: 63).

The State argued for the maximum punishment under the law as the only means by which appellant would no longer be able to drive a car and be a threat to the community. (RR X: 88). Punishment evidence showed appellant had abused drugs since at least 1979 and that she had caused another car wreck in 2009 due to intoxication via painkillers. She continued to abuse drugs and drive despite having had her nursing license suspended and having been placed on misdemeanor probation for the 2009 collision, with ordered drug and alcohol assessments. (SX139). The State argued, and the evidence certainly supported, that appellant had learned nothing from her past mistakes and that her crime was one of "complete and total disregard of everybody's safety for her own needs." (RR X: 93). Appellant was selfish, deceptive, and reckless. (RR X: 105). Furthermore, the length of the crime scene was not addressed by the parties in the punishment phase, either via evidence or argument, and arguably played no role in the

punishment verdict. There is no reasonable probability that juror Darnell's visit to the crime scene, a public place with which she was already familiar, had a prejudicial effect on the "hypothetical average juror." *McQuarrie*, 380 S.W.3d at 154.

This third point of error should be overruled for numerous reasons.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, the State prays this Court to overrule the appellant's points of error and to affirm the trial court's judgment.

Respectfully submitted,

ROSEMARY LEHMBERG
District Attorney
Travis County, Texas


*/s/ Lisa Stewart*
Lisa Stewart
Assistant District Attorney
State Bar No. 06022700
P.O. Box 1748
Austin, Texas 78767
Lisa.Stewart@traviscountytx.gov
AppellateTCDA@traviscountytx.gov
(512) 854-9400
Fax No. 854-4810

## CERTIFICATE OF COMPLIANCE

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(2)(A), the State certifies that the length of this brief is 10,759 words. The State also certifies, pursuant to Texas Rule of Appellate Procedure 9.4(e), a conventional typeface 14-point was used to generate this brief.

*/s/ Lisa Stewart*
Lisa Stewart
Assistant District Attorney

## CERTIFICATE OF SERVICE

I hereby certify that, on the 8th day of December, 2015, a true and correct copy of this brief was served, by U.S. mail, electronic mail, facsimile, or electronically through the electronic filing manager, to the Appellant's attorneys, Steven Brand, Fagerberg, Arana & Brand, P.C., 907 Rio Grande Street, Austin, Texas 78701, stevenbrand@rocketmail.com; and Linda Icenhauer-Ramirez, Attorney at Law, 1103 Nueces, Austin, Texas 78701, ljir@aol.com.

*/s/ Lisa Stewart*
Lisa Stewart
Assistant District Attorney